In re THIRD EIGHTY–NINTH
ASSOCIATES, Debtor.

The CHASE MANHATTAN BANK
(NATIONAL ASSOCIATION),
Appellant,

v.

THIRD EIGHTY–NINTH ASSOCIATES,
Appellee.

No. 91 Civ. 8659 (RWS).

United States District Court,
S.D. New York.

Feb. 10, 1992.

Dewey Ballantine, New York City, for appellant. John M. Friedman, Jr., of counsel.

Haythe & Curley, New York City, for appellee. Michael V. Blumenthal, of counsel.

## OPINION

SWEET, District Judge.

The Chase Manhattan Bank, National Association ("Chase") appeals from a November 25, 1991 final order of the Honorable Burton R. Lifland, Chief Judge of the Bankruptcy Court of the Southern District of New York (the "Order"), enjoining Chase from taking any further action in its suit against Thomas LaSala ("Thomas"), Kenneth LaSala ("Kenneth") and Jacob I. Sopher ("Sopher") (collectively, the "Guarantors"), the guarantors of certain loans made by Chase to the debtor in this Chapter 11 proceeding, Third Eighty–Ninth Associates (the "Debtor"). This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). For the following reasons, the Order is affirmed as to Thomas and reversed and remanded for proceedings consistent with this opinion with respect to Kenneth and Sopher.

### Background

The Debtor is a New York limited partnership which constructed and owns a 263–unit condominium apartment building in Manhattan (the "Monarch"). It is also the sponsor of fifty-three residential and three commercial units in the Monarch which presently remain unsold (the "Unsold Units").

LaSala 89th Street Development Company ("LSDC") and Sopher are the Debtor's managing general partners. Thomas and Kenneth are the managing general part-ners of LSDC, though neither is, individually, a partner of the Debtor. *Tr.* at 44. Sopher, the Debtor's other general partner, heads the J.I. Sopher Company, which he proclaims to be the "premiere renting and selling" real estate agency in New York. *Tr.* at 57. Sopher orchestrated the sales of the sold units in the Monarch and is responsible for obtaining lessors for the Unsold Units. Thomas and Kenneth are also the sole officers of LaSala Management, Inc. ("LSM"), the managing agent of the Monarch. It is undisputed that LSM is responsible for the day-to-day operation of the Monarch. *Tr.* at 40–41.

From August 1985 through November 1987, Chase made a series of loans to the Debtor, secured by certain mortgages on the Monarch, to finance the construction of the building. In respect to a loan of $5,050,000 made in November 1987, Thomas, Kenneth and Sopher executed a guaranty in an amount limited to $1,093,000 (the "Guaranty").

The Debtor defaulted on the loans to Chase, the remaining principal amount of which is somewhere between $9.3 and $10.6 million. On July 26, 1991, Chase commenced an action in New York State Supreme Court seeking to foreclose on the Monarch in satisfaction of the outstanding amounts. Chase also commenced a state court action against Thomas, Kenneth and Sopher seeking judgment on the Guaranty in the sum of $1,093,000 (the "Guaranty Action").

Settlement discussions between the Debtor, Chase and the Guarantors took place in August 1991, pending which the two state actions were voluntarily stayed pursuant to a Standstill Agreement dated September 5, 1991. Chase terminated the Standstill Agreement on October 8, 1991, which, according to Thomas, caused the Debtor to file its Chapter 11 petition on October 9, 1991. *Tr.* at 27–28.

On November 5, 1991, the Debtor commenced an adversary proceeding in the Bankruptcy Court seeking an injunction pursuant to 11 U.S.C. § 105 staying Chase from proceeding against the Guarantors in the Guaranty Action until the consumma-

tion of a plan of reorganization. Chase opposed this motion and simultaneously moved to lift stay pursuant to 11 U.S.C. § 362(d) and to dismiss the Debtor's Chapter 11 petition.

Following a hearing on November 25, 1991 (the "Hearing"), Chief Judge Lifland denied Chase's lift stay and dismissal motions and granted the Debtor's motion under 11 U.S.C. § 105, entering an order "permanent[ly]" enjoining Chase from proceeding against the Guarantors in the Guaranty Action until February 9, 1992. Chief Judge Lifland concluded that the estate would be adversely affected in the absence of the stay because the Guaranty Action would impair the Guarantors' ability to infuse capital into the reorganization, *Tr.* at 117, and would detract from their "key" roles in maintaining, operating and protecting the Debtor's principal asset. *Tr.* at 119. He also concluded that "without [Sopher's], perhaps, heavy handed manipulation of the rental market, ... the building would not even be as fully rented as it is." *Id.*

Chase filed a notice of appeal from the November 25, 1991 order on December 4, 1991, claiming that the Bankruptcy Court abused its discretion by staying the Guaranty Action in the absence of evidence establishing that the Debtor was entitled to this extraordinary relief. Oral argument was originally scheduled to be heard on March 5, 1992. In view of the imminence of the stay's expiration, however, the court agreed to hear oral argument on February 3, 1992, on which date the appeal was considered fully submitted.

*Discussion*

■ Under Federal Rule of Bankruptcy Procedure 8013, this court reviews the Bankruptcy Court's findings of fact under the clearly erroneous standard and reviews its conclusions of law *de novo.* Fed. R.Bankr.P. 8013; *see In re Lomas Fin. Corp.,* 117 B.R. 64, 66 (S.D.N.Y.1990); *In re Costa & Head Land Co.,* 68 B.R. 296, 298 (N.D.Ala.1986). Under the clearly er-

roneous standard, the court will reverse if "'left with the definite and firm conviction that a mistake has been committed.'" *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir.1990) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)), *quoted in Lomas,* 117 B.R. at 66. Based on the record, the criterion for reversal has been met.[1]

Chief Judge Lifland stayed Chase's action against the Guarantors pursuant to his authority under 11 U.S.C. § 105(a). Section 105(a) gives a bankruptcy court the power to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." This section bestows authority on the bankruptcy court to "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Neuman,* 71 B.R. 567, 571 (S.D.N.Y.1987).

■ It is commonly recognized that this authority includes the power to enjoin a party from proceeding against non-debtor third parties, but only under "limited circumstances." *See, e.g., Costa & Head,* 68 B.R. at 298 (action against partners of debtor; stay denied); *In re Lahman Manufacturing Co.,* 33 B.R. 681, 682 (Bankr. S.D.1983) (action against officers/guarantors of debtor; stay granted); *In re Otero Mills, Inc.,* 21 B.R. 777, 778 (Bankr.N.M. 1982) (action against officer/guarantor of debtor; stay granted), *aff'd,* 25 B.R. 1018 (D.C.N.M.1982). Because the practical effect of such an injunction is to broaden the scope of the automatic stay beyond the terms of 11 U.S.C. § 362(a), this is a power that must be used "sparingly." *See In re University Medical Ctr.,* 82 B.R. 754, 755 (Bankr.E.D.Pa.1988). The debtor bears the burden of proof in obtaining the "extraordinary and drastic remedy" of an injunction. *Costa & Head,* 68 B.R. at 298.

The Debtor makes much ado over Chase's suggestion that a stay under § 105(a) is available only upon a showing of irreparable harm and the other tradition-

---

**1.** Conclusions of the Bankruptcy Court based on testimony offered by a witness at a hearing before that court are considered factual findings, and therefore can be reversed only if clearly erroneous. *In re Lomas Fin. Corp.,* 117 B.R. 64, 67 n. 2 (S.D.N.Y.1990).

al criteria for a preliminary injunction. The Debtor argues that, inconsistencies notwithstanding, under the standard within this district for the issuance of an injunction pursuant to § 105, a creditor's state court action against a non-debtor third party may be stayed if the action would " 'embarrass, burden, delay or otherwise impede the reorganization proceedings.' " *In re Neuman,* 71 B.R. 567, 571–72 (quoting *Jaytee–Penndel Co. v. Bloor,* 547 F.2d 13, 16 (2d Cir.1976), if the proceeding would "defeat or impair" the bankruptcy court's jurisdiction or if the stay is necessary "to preserve or protect the debtor's estate and reorganization prospects." *In re AP Indus., Inc.,* 117 B.R. 789, 802 (Bankr. S.D.N.Y.1990); *see also In re Chateaugay Corp.,* 93 B.R. 26, 29 (S.D.N.Y.1988); *In re Johns–Manville Corp.,* 91 B.R. 225, 227–28 (Bankr.S.D.N.Y.1988); *see* 2 *Collier on Bankruptcy* ¶ 362.05 (15th ed. 1982) ("[t]he court will have ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process....").

This opinion need not contribute to this debate in view of my prior expression on the subject, *see Neuman,* 71 B.R. at 571–72. More importantly, the record demonstrates that it was not clearly erroneous to enter the stay of the Guaranty Action against Thomas and the Debtor has not satisfied its burden under even the lower standard with respect to Kenneth and Sopher.

Pursuant to their authority under § 105, courts have stayed creditor actions against non-debtor third parties where they have found that the estate will be adversely affected because the action will impede the non-debtor third party from injecting funds into the reorganization, because the action would detract from the invaluable time and attention the non-debtor third party would otherwise devote to the continued operation of the debtor's business or the reorganization effort, or because the claims against the non-debtor third parties are really claims against the debtor and therefore impair the automatic stay. The Bankruptcy Court found that the existence of the first two of these conditions warranted imposition of the stay.

Chief Judge Lifland concluded that the Guarantors were "key" to the Debtor's reorganization. *Tr.* at 119. Indeed, if it was established that the estate would suffer if the Guarantors' services and attention were compromised by the distraction of defending against the Guaranty Action, this factor could justify a stay. Courts have stayed creditor actions against non-debtor third parties under this rationale where, for example, an officer devoted over 50% of his time to and was "irreplaceable" in the reorganization effort, *In re Lomas Fin. Corp.,* 117 B.R. 64, 66 (S.D.N.Y.1990), where an officer was a "key staff member" of the reorganization task force, *id.,* where the principals/guarantors performed all or most of the debtor's business, *In re Rustic Manufacturing, Inc.,* 55 B.R. 25, 31 (Bankr.W.D.Wis.1985), and where the general partner was "intimately connected" with the management of the debtor's business, *In re Northlake Building Partners,* 41 B.R. 231, 233 (Bankr.N.D.Ill.1984). On the other hand, where a general partner testified about his duties for the debtor "largely in generalities," the court found the evidence that the estate would be burdened if malpractice actions were allowed to proceed against him insufficient to justify a stay under § 105. *University Medical Ctr.,* 82 B.R. at 758.

Chief Judge Lifland's second conclusion in support of the stay was that the Guaranty Action would impair the funding of the reorganization because the Guarantors were willing to infuse $1.4 million. Indeed, where present and substantial, this factor may justify relief under § 105. *University Medical Ctr.,* 82 B.R. at 758. For instance, courts have stayed creditor actions against non-debtor third parties where the only source of adequate financing for the reorganization was the personal real estate of the principals/guarantors against which the creditor sought to foreclose, *Lahman Manufacturing Co.,* 33 B.R. at 683, and where it was uncontested that an officer/guarantor intended to sell the property upon which the creditor would foreclose and contribute the proceeds to the debtor

to pay corporate debts, *Otero Mills*, 21 B.R. at 779. In contrast, this factor did not justify a stay under § 105 where general partners "were extremely vague on their projected personal financial commitments to the Debtor's rehabilitation" and "the degree of the showing that such commitments will be likely to be required and to be made" was not substantial, *University Medical Ctr.*, 82 B.R. at 756–58, or where there was no evidence that securities pledged by general partners were actually available to the debtor or could be used realistically in the reorganization. *In re Costa & Head Land Co.*, 68 B.R. 296, 301–02 (N.D.Ala.1986).

■ Based on Thomas's affidavit and Hearing testimony, it was not clearly erroneous to find that Thomas's involvement in the Debtor's business and reorganization would be sufficiently impeded by the Guaranty Action to constitute a burden on the estate.

Thomas testified that he and Kenneth are responsible for collecting rent and common charges, paying bills, making repairs, assuring that the building is rented to its highest capacity, conducting tenant relations, supervising building staff and acting as liaison with the board of the Monarch, *Tr.* at 40–41. Although the cross-examination established that many of these functions are actually performed by LSM's staff, including clerks and a superintendent, it was also uncontested that these activities take place under his direct supervision. *Tr.* at 44–45, 47–48, 54. Thomas testified that he devotes up to fifty percent of his time to the Monarch and "managing the Debtor," *Tr.* at 43. While the "key" nature of Thomas's role in the Debtor's business and reorganization may not have been established to the degree shown in some of the cases cited above, it was not clearly erroneous to conclude that the estate would be adversely affected if deprived of his services.[2]

■ With respect to Kenneth and Sopher, however, the record does not establish that either of the factors cited by the Chief Judge Lifland is present in this case. In this regard, the conclusions of the court in *University Medical Center*, 82 B.R. 754, are particularly apt. There, the court stated that although the debtor's counsel

asked their witnesses the right questions ..., focusing upon their time and financial commitments to reorganization which might be adversely impacted by the bankruptcy.... [t]heir difficulty was that their witnesses provided answers to their questions which simply failed to satisfy the demanding criteria imposed upon them.

*Id.* at 757.

Kenneth did not even testify or submit an affidavit to permit an assessment of the depth of his commitment to the Debtor's reorganization efforts, *see University Medical Ctr.*, 82 B.R. at 758. In his testimony, Thomas did claim that both he and Kenneth perform the various management functions he described. Nevertheless, with one insignificant exception, the record is devoid of any evidence of the extent of Kenneth's responsibilities in particular, the extent of his ability and/or willingness to fund the reorganization, or the extent to which either or both would be impacted by having to defend against the Guaranty Action.

On the record, it was also clearly erroneous to find that Sopher performs functions for the Debtor and the reorganization effort that would be impeded by the State Court Action. Although Sopher's vigorous policies with respect to selling and renting units in the Monarch are said to be invaluable to the Debtor, the record demonstrates that Sopher's role at this point does not extend beyond policy making. He testified, for instance, that he personally does not show apartments, but rather delegates this task to his 150 sales agents. *Tr.* at 68. There is no evidence that defending against the Guaranty Action would in any way impair Sopher's ability to sustain and implement his policies.

---

2. Under the cited case law, it also would not have been clearly erroneous to conclude that allowing the continuation of the Guaranty Action against Thomas would cause the debtor "irreparable harm."

The record also does not support the finding that the Guaranty Actions would burden the estate by impairing an infusion of capital. The Guarantors have proposed, and purportedly remain willing, collectively to inject $1.4 million into the reorganization. *Tr.* at 37–38. Nevertheless, except for Thomas's testimony that defending the Guaranty Action would impair *his* ability to make capital contributions, *Tr.* at 38, the record contains no evidence that a joint judgment against the Guarantors would affect their collective ability to make such an infusion. Perhaps more importantly, the Guarantors have until now conditioned this infusion of capital on Chase's release of the Guaranty and some of its security interests in the Monarch. *See, e.g., Tr.* at 50, a proposal decisively rejected by Chase. The conditional nature of the infusion casts serious doubt on whether any funds actually are available to the Debtor for use in the reorganization. *See Costa & Head Land Co.,* 68 B.R. at 301–02 (N.D.Ala.1986).

A third justification articulated by courts in entering stays pursuant to § 105 is that the claims against the non-debtor third parties are really claims against the debtor and therefore attempts at an "end run" around the automatic stay. *See, e.g., Lomas,* 117 B.R. at 67–68 (suit against officers for making misrepresentation upon which creditor relied in making loan to debtor corporation; adverse judgment could collaterally estop debtor's defenses); *In re Comark,* 53 B.R. 945 (Bankr.C.D.Cal. 1985) (suit against partners on partnership debt); *In re Old Orchard Inv. Co.,* 31 B.R. 599 (W.D.Mich.1983) (same). Chief Judge Lifland made no finding as to this factor, and it therefore need not be addressed here. Suffice it to say, however, that upon this record, this rationale would not support imposition of a stay under § 105. This is not a back-door attempt to acquire assets of the Debtor, but rather an action on independent obligations of the Guarantors, two of whom are not even general partners of the Debtor in their own right. Nor does there appear to be any realistic threat that any issues determined in the Guaranty Action could be used to collaterally estop the Debtor in defending against Chase's claim.

*Conclusion*

For the foregoing reasons, the findings of the Bankruptcy Court in support of its November 25, 1991 order staying the Guaranty Action by Chase against Kenneth and Sopher are clearly erroneous, and therefore the order is reversed as to these Guarantors and the matter is remanded to the Bankruptcy Court for further proceedings consistent with this proceeding. The order is affirmed as to Thomas.

It is so ordered.