In re LAZARUS BURMAN ASSOCIATES, L.B. Management Co., Jerry Lazarus Management Co., Red Ground Co., Surrey Co., and Connie Lazarus Management Co., Debtors.

LAZARUS BURMAN ASSOCIATES, L.B. Management Co., Jerry Lazarus Management Co., Red Ground Co., Surrey Co., and Connie Lazarus Management Co., Plaintiffs,

v.

NATIONAL WESTMINSTER BANK USA, Defendant.

Bankruptcy Nos. 193–11845–260 to 193–11847–260 and 193–12060–260 to 193–12062–260.
Adv. No. 193–1275.

United States Bankruptcy Court, E.D. New York.

Dec. 20, 1993.

---

Parker, Chapin, Flattau & Klimpl by Joel Lewittes, Leslie W. Chervokas, Andrew Sherman, New York City, for plaintiff.

Paterson, Belknap, Webb & Tyler, New York City (David W. Dykhouse, Lisa Napolitano, of counsel), for defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

CONRAD B. DUBERSTEIN, Chief Judge.

On March 5, 1993, several of the above Debtors, Lazarus Burman Associates ("LBA"), Lazarus Burman Management Co. ("LBMC"), and Jerry Lazarus Management Co. ("JLMC") each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

On March 11, 1993, the remaining Debtors, Red Ground Co., Surrey Co. ("Surrey") and Connie Lazarus Management Co., each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

All of the above Debtors are hereinafter referred to collectively as the "Debtors".

On March 22, 1993, all of the Debtors' cases were consolidated for administrative purposes only.

The Debtors are general partnerships organized under the laws of the State of New York and are engaged in the business of owning, developing and managing commercial properties located in Long Island, New York.

The sole general partners of each of the Debtors are Jerome Lazarus ("Lazarus") and Jan Burman ("Burman") (collectively, the "Principals"). They manage the Debtors and are also general partners of non-Debtor entities which also develop or manage properties in Long Island, New York.

The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Neither a creditors'

committee, trustee, nor an examiner has been appointed in these cases.

On or about May 12, 1993, National Westminster Bank USA ("NatWest") filed an action against the Principals entitled *National Westminster Bank USA v. Jerome Lazarus and Jan Burman,* Index No. 93–111992 (the "State Court Action") in the Supreme Court of the State of New York, New York County, to enforce payment of their Note in the sum of $6,000,000 under a line of credit granted by NatWest to them.

The Debtors commenced the instant adversary proceeding in this Court (the "Adversary Proceeding") to obtain injunctive relief to stay the State Court Action.

In this Adversary Proceeding, the Debtors moved by order to show cause for the issuance of a temporary restraining order and presented an application for a preliminary injunction pursuant to section 105(a) of the Bankruptcy Code and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking to enjoin the State Court Action.

After a hearing on June 11, 1993, this Court issued a temporary restraining order (the "TRO"), finding, for purposes of the TRO, that the prosecution of the State Court Action would cause the Debtors' reorganization efforts to suffer immediate and irreparable harm, and scheduled a plenary hearing regarding the Adversary Proceeding for June 22, 1993.

On June 22, 1993, this Court heard oral testimony and received written evidence regarding, *inter alia,* the overall involvement of the Principals in the Debtors' reorganization efforts and their intention to provide for a meaningful plan of reorganization. The Bankruptcy Court continued the hearing and the TRO until July 7, 1993.

On July 7, 1993, this Court continued to take testimony and hear evidence and thereafter concluded the hearing. To facilitate a consensual resolution of the parties' underlying disputes, this Court reserved decision on the issuance of the preliminary injunction, scheduled a status conference for August 5, 1993 and continued the TRO.

At the August 5, 1993 status conference, this Court was informed that the Principals on behalf of themselves and the Debtors were attempting to negotiate a resolution of their dispute with NatWest. This Court continued the TRO and scheduled a status conference for September 7, 1993. The September 7, 1993 status conference was adjourned by the parties to September 9, 1993.

On September 9, 1993, this Court heard argument of counsel, and again continued the TRO to encourage a global settlement of the dispute with NatWest. On September 17, 1993 NatWest filed a notice of appeal in the District Court from this Court's direction to continue the TRO.

On or about October 26, 1993, the Debtors moved before the District Judge to dismiss the appeal for lack of subject matter jurisdiction. This Court was thereafter informed that the District Judge determined that the TRO had expired by operation of law and there was no order before him from which an appeal could be taken.

Thereafter, and on November 8, 1993 the parties returned to this Court at which time, with the consent of the attorneys for the Debtors and NatWest, it ordered them to submit proposed findings of fact and conclusions of law so that the Court may render a decision on the merits of the relief sought by this Adversary Proceeding. In accordance therewith, proposed findings of fact were submitted. After consideration of the same, this Court makes the following findings of fact in lieu of its adoption of the proposed findings of fact submitted by said attorneys.

*FINDINGS OF FACT*

1. To finance the purchase, development and improvements of the Debtors' and non-Debtor properties, Surrey and the Principals accumulated aggregate indebtedness to NatWest of approximately $11,375,000. (Affidavit of Jan Burman, sworn to June 9, 1993 (the "Burman Affidavit"), Para. 6), as is hereinafter more particularly set forth.

2. Pursuant to certain loan documents, on or about August 9, 1985, NatWest made a loan (the "Surrey Loan") and advanced approximately $5,375,000 to Surrey Corp., a

predecessor-in-interest to Surrey. The Surrey Loan is secured by a mortgage on certain real property and improvements known generally as 270–280 Duffy Avenue, Hicksville, New York (the "Duffy Property"). The Surrey Loan documents were supplemented and extended by letter agreements dated as of August 9, 1990, January 1, 1991 and March 1, 1992, respectively. (*Id.* Para. 11).

3. In or about September, 1989, the Principals renewed a previous line of credit in the original principal amount of up to $6,000,000 previously obtained from NatWest (the "Line of Credit" or the "Line"). The Line was renewed on December 3, 1990 and expired on August 15, 1991. Thereafter, repayment of the Line, but not the right to further borrowings, was extended by letter agreements dated August 15, 1991 and January 15, 1992 effective as of June 1, 1992, hereinafter referred to collectively as the "Line of Credit Agreements". (Burman Aff. Para. 7 and Ex. A).

4. In response to NatWest's demands, the Principals, in their individual capacities, executed and delivered to NatWest a promissory note (the "Note") dated June 1, 1992 in the principal amount of $6,000,000. (Burman Aff. Para. 8). (Debtors' Ex. 6, Official Transcript of June 22, 1993 Bankruptcy Court Hearing, pp. 45–46).

5. The Note matured in accordance with its terms on November 1, 1992.

6. The Line of Credit Agreement dated June 1, 1992 executed in connection with the Note states that the indebtedness of the Principals under the Note is the personal, full recourse, joint and several obligation of each of them, payable without defense, offset, deduction or counterclaim whatsoever. (Agreement p. 3. The Agreement was admitted as Debtors' Exhibit 5, June 22 Trans. p. 40).

7. In the Note, the Principals waived any right to interpose any setoff or counterclaim in any litigation involving NatWest and stated that the Note and other Agreements executed in connection therewith constitute their entire agreement with NatWest. (Note p. 1). They affirmed that they were not relying on any oral representation in connection with the Note. (Note p. 1).

8. None of the Debtors guaranteed the Note (July 7 Trans. p. 47), and none of the Debtors disclosed any liability, direct or contingent, in connection with the Note on any statement or schedule filed with this Court in its Chapter 11 case. (July 7 Trans. pp. 43–47).

9. There is no evidence that any of the Debtors has an obligation to indemnify the Principals with respect to sums paid by either of them to NatWest under the Note.

10. There is no evidence that the Debtors would incur any liability to any party to the State Court Action regardless of its outcome.

11. In connection with the restructuring of the Line, in March of 1991, it was contemplated that the Duffy Property was to be collateral in part for the Line. (June 22 Transcript at p. 85); (Burman Aff. Para 9). However, NatWest was concerned with the value of the Duffy Property due to the existence, known to NatWest, of an environmental problem with the Duffy Property. (*Id.*).

12. The Note contains a cross-default provision.

13. The cross-default provision states as follows:

Special provisions. If the obligor or any corporation, the majority of issued and outstanding shares of which are owned by Jerome Lazarus ("Lazarus") or Jan Burman ("Burman"), or any partnership or other entity in which Lazarus and Burman have a controlling interest, or any limited partnership or other entity controlled by any of them is a general partner, shall default in any obligation or debt to the Bank, the Liabilities shall become absolute, due and payable without demand or notice to any Obligor.

(Burman Aff. Ex. A).

14. The term "Liabilities" under the Note is defined as:

[T]his note, liabilities and all other indebtedness and obligations of any kind of any Obligor to the Bank, now or hereafter existing, arising directly between any Obligor and the Bank or acquired by assign-

ment, conditionally or as collateral security by the Bank … [.]

(Burman Aff. Ex. A).

15.  The June 1, 1992 Agreement acknowledges that the Duffy Property was purchased and/or improved with the proceeds previously made available to the Principals under the Line and that the sale of the Duffy Property or the refinancing of the Surrey Loan would cause the Note to become due and payable, as appears from the following:

> In the event of the sale prior to the maturity date of the Line of either or both of the real properties commonly known as 270–280 Duffy Avenue, Hicksville, NY and 2545 Hempstead Turnpike, East Meadow, NY which were purchased and/or improved with funds borrowed under the Line, or in the event of the refinancing prior to the maturity date of the Line of any debts secured by lien on such properties, the proceeds of such sale or refinancing less all existing mortgage debt on such properties and less all reasonable selling or refinancing expenses shall be paid to the Bank to be applied to the reduction of the Current Outstanding under the Line.…

(Burman Aff. Para. 10 and Ex. B).

16.  Jeffrey Cohen ("Cohen"), the Debtors' Controller, testified that all funds drawn from the Line of Credit were used to improve either Debtor or non-Debtor properties, and NatWest was always aware, in advance, of how the funds from the Line of Credit were to be applied.  (June 22 Transcript at pp. 64–70).

17.  Cohen explained the method which was used to draw upon the Line of Credit: Cohen would telephone Cynthia Marshall, a Vice President of NatWest, and request that she authorize the transfer of a specified sum of money directly into the account of the business entity that needed money (June 22 Transcript at pp. 64–66);  that thereafter, such transaction would be confirmed in writing (June 22 Transcript at p. 65);  that although one or any of the Debtors or any related entity may have received the proceeds of the Line, the bill for such monies was submitted to the Principals (June 22 Transcript at p. 66);  that although NatWest billed the Principals, the bill and the interest thereon was always paid by the Debtor or other entity that had received the funds. (June 22 Transcript at pp. 66–67).

18.  A chart admitted into evidence, and the testimony of Cohen and Burman at the June 22 Hearing indicate that the proceeds of the Line of Credit in the total amount of $2,850,000 was transferred to Debtor entities as follows:

| DEBTOR | DATE | AMOUNT | |
|---|---|---|---|
| Jerry Lazarus Mgt. Co. | 6–12–90 | $200,000 | |
| | 8–14–90 | 75,000 | |
| | 9–17–90 | 50,000 | |
| | 11–15–90 | 60,000 | $385,000 |
| Surrey Co. | 6–12–90 | $100,000 | |
| | 8–03–90 | 150,000 | |
| | 8–14–90 | 250,000 | |
| | 8–20–90 | 40,000 | |
| | 8–27–90 | 60,000 | |
| | 9–17–90 | 175,000 | |
| | 11–09–90 | 200,000 | |
| | 11–15–90 | 200,000 | |
| | 12–11–90 | 100,000 | |
| | 01–02–91 | 400,000 | |
| | 01–31–91 | 250,000 | |
| | 02–13–91 | 100,000 | |
| | 03–15–91 | 200,000 | |
| | 04–10–91 | 90,000 | $2,315,000 |
| Red Ground Co. | 10–02–90 | $150,000 | |
| | | | 150,000 |
| | | | $2,850,000 |

(*See* Debtors' Ex. 7; June 22 testimony of Cohen and Burman, pp. 64–70, 86–89).

19. As appears from Debtors' Exhibit 7 above, a substantial portion ($2,315,000) of the Line of Credit was funded to Surrey.

20. Burman testified that the Principals used the monies from the Line of Credit to renovate the Duffy Property to convert it to a research and development office building. (June 22 Transcript at pp. 82–89). He testified that representatives of NatWest were aware that such monies were spent to improve Debtor or non-Debtor property and they even came out to inspect how the funds were used. (June 22 Transcript at pp. 82–89). As a result of using the funds from the Line of Credit, Burman claimed that the rent roll for the Duffy Property more than doubled and the property's value rose from approximately $5.5 million to $11.5 million. (June 22 Transcript at pp. 88–89).

21. Testimony of Cohen, as well as evidence introduced at the Hearing, consisting of checks, bills and other documents demonstrated that the Debtor entities paid the interest due under the Line. (Debtors' Ex. 3 and June 22 Transcript at pp. 66–67).

22. In his testimony, Mr. William H. Bandy, a Vice President of NatWest, who did not hold that position when the loans were originally made, did not controvert the foregoing evidence, and acknowledged that certain checks drawn from Debtor accounts appeared to have been used to make payments due under the Line. (June 22 Transcript at pp. 28–34).

23. This Court finds that the Principals bore, and continue to bear, the sole responsibility for the day-to-day operations of the Debtors' businesses (Burman Aff. Para. 13); that the Principals are involved in making daily decisions regarding the Debtors' affairs (Burman Aff. Para. 14); and that Burman on behalf of the Principals spends time managing tenant relations, arranging capital improvements, and supervising the management of the rental properties. (Burman Aff. Para. 14–16; June 22 Transcript at p. 77).

24. This Court further finds that the Principals are involved in negotiating leases, approving contractor bills, dealing with various banks and financing institutions, examining properties, dealing with brokers, and speaking with attorneys relative to those transactions (June 22 Transcript at pp. 77–78, 96–98; Burman Aff. Para. 14–16); that they undertook and continue to undertake some or all of the following activities on a daily basis: handle tenant inquiries; address tenant requests; decide the capital needs for tenant improvements; supervise the Debtors' employees regarding tenant relations; leasing of empty space and negotiating those leases; and approving payments to contractors and various bills. (June 22 Transcript at p. 77; Burman Aff. Para. 14–16).

25. Although Lazarus is semi-retired and maintains residences in New York and Florida, this Court finds that he is involved in all major financial and other decisions involving the Debtors' affairs. (June 22 Transcript at pp. 126–31; July 7 Transcript at p. 7).

26. This Court also finds that during the pendency of these consolidated cases, Lazarus has actively participated in negotiations with the Debtors' major creditor, CrossLand Federal Savings Bank ("CrossLand") and with NatWest; that he has attended various meetings to restructure the debts with both Banks, and that he will be actively involved in formulating and negotiating a plan of reorganization. (June 22 Transcript at pp. 128–130; July 7 Transcript at pp. 4, 17).

27. This Court also finds that since the Petition Dates, in addition to all of the foregoing, and under the direct supervision of the Principals, the Debtors have permitted CrossLand to conduct an audit as part of its due diligence in connection with the proposed refinancing of the Debtors' loans with Cross-Land, that they were responsible for the preparation and filing of the schedules required by the Bankruptcy Code, operating reports for filing in this Court and for the United States Trustee as required by the Bankruptcy Code and the Bankruptcy Rules, that they were involved in analyzing the Debtors' leases and executory contracts affecting the Debtors' affairs to determine whether to reject or assume them, engaged in discussions with special environmental counsel Winston & Strawn, Esqs. regarding

the status of an environmental problem with the Duffy Property, prepared for and attended hearings, and both have been engaged in the preliminary formulation of the Debtors' plan or plans of reorganization. (Burman Aff. Para. 17).

28. This Court finds that if the State Court action is allowed to proceed, the time for the Principals to attend to the reorganization of the consolidated Debtors in this Court and in the operation of their businesses would be substantially diminished; that they would be required to examine files, financial records and many other documents which would necessitate their assistance in such preparations, and that the Debtors' operations would be disrupted by the State Court Action. (June 22 Transcript at pp. 99, 125).

29. This Court also finds that in order to go forward with a plan or plans of reorganization for the Debtors, the Principals intend to inject between $1 million to $1.6 million to assist in the Debtors' restructuring of their loans with CrossLand (June 22 Transcript at pp. 90, 91, 106–07); that if necessary, they contemplate injecting funds to restructure their and the Debtors' indebtedness with NatWest (June 22 Transcript at p. 92); and that if this Court fails to enjoin the State Court Action against the Principals during the pendency of these cases, such failure could have substantial detrimental effects on the Debtors' reorganization by impairing the Principals' ability to raise such funds. (June 22 Transcript at p. 91).

30. On March 12, 1993, this Court issued a temporary restraining order against certain personal guaranty actions commenced by CrossLand against the Principals in the United States District Court, Eastern District of New York. CrossLand has appeared in this Court and has informed this Court that progress is being made toward a final settlement of CrossLand's claims.

By reason of all of the foregoing, and for the reasons hereinafter set forth in the following Conclusions of Law, the motion of the Debtor for a preliminary injunction is hereby granted.

## CONCLUSIONS OF LAW

### Jurisdiction of this Court

This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. The proceedings are deemed to be core proceedings as defined by § 157(b)(2)(A), dealing with matters dealing with administration of the estate and (O), dealing with the adjustment of debtor/creditor relationship.

### Power of the Bankruptcy Court to Issue an Injunction

There is no question but that the enforcement actions of lien creditors, such as NatWest, are not unqualifiedly restrained by the automatic stay of § 362 of the Bankruptcy Code. The source of the Court's power, if any, to impose a stay on lien creditors must be found in § 105 of the Bankruptcy Code.

■ Section 105(a) of the Bankruptcy Code contains the statutory authority for the court's injunctive powers. This section provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [Title 11]." 11 U.S.C. § 105(a). When an action by a creditor of a debtor against a non-debtor third party threatens a debtor's reorganization, the creditor's action may be enjoined pursuant to section 105(a). *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir.1986), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Litchfield Co. of South Carolina, L.P.*, 135 B.R. 797 (W.D.N.C.1992); *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 434 (Bankr. S.D.N.Y.1990), *aff'd in part*, 124 B.R. 635 (S.D.N.Y.1991); *In re Monroe Well Service, Inc.*, 67 B.R. 746 (E.D.Pa.1986); *In re Sudbury, Inc.*, 140 B.R. 461 (Bankr.N.D.Oh. 1992); *In re Codfish*, 97 B.R. 132, 135 (Bankr.D. P.R.1988); *In re Johns–Manville Corp.*, 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983), *aff'd*, 40 B.R. 219 (S.D.N.Y.1984), *rev'd in part*, 41 B.R. 926 (S.D.N.Y.1984). *See In re Keyco, Inc.*, 49 B.R. 507 (Bankr.E.D.N.Y. 1985), where this Court refused to stay a state court action where the facts involved did not justify an injunction.

■ The Bankruptcy Court has the power to issue an injunction to preserve the orderly conduct and integrity of reorganization proceedings. *See In re Third Eighty–Ninth Associates,* 138 B.R. 144 (S.D.N.Y.1992); *LTV Corp. v. Miller (In re Chateaugay Corp.),* 109 B.R. 613, 621 (S.D.N.Y.1990); *In re AP Industries, Inc.,* 117 B.R. 789 (Bankr. S.D.N.Y.1990); *In re Chateaugay Corp.,* 93 B.R. 26, 29 (S.D.N.Y.1988) *quoting In re Baldwin United Corp. Litig.,* 765 F.2d 343, 348 (2d Cir.1985).

The legislative history of § 362 of the Bankruptcy Code indicates that Congress intended that the scope of the automatic stay be broad in order to give a debtor a breathing spell by stopping all collection efforts and harassment by creditors while permitting the debtor to attempt a reorganization plan. *See H.R.Rep. No. 595,* 95th Cong., 1st Sess. 340 (1977); *S.Rep. No. 989,* 95th Cong.2d Sess. 49 (1978), reprinted in 1978 U.S.Code Cong. & Ad. News 5787, 5963, 6296–97.

In the matter of *In re Johns–Manville Corp.,* 33 B.R. 254 (Bankr.S.D.N.Y.1983), the court invoked §§ 105 and 362 to stay and enjoin "all persons and entities, and their counsel from commencing, continuing or taking any action of any type against present, former or future officers, directors or employees of Manville or any of its corporate entities in any lawsuit or other proceeding." *Id.* at 263. In so ruling, the Court stated that:

[T]his Court, pursuant to § 105(a) of the Bankruptcy Code, may extend the automatic stay under § 362 of the Bankruptcy Code to stay and enjoin proceedings or actions by or against non-debtors where such actions would interfere with, deplete or adversely affect property of the Manville estates or which would frustrate the statutory scheme embodied in Chapter 11 or diminish Manville's ability to formulate a plan of reorganization.

Courts have granted injunctions under § 105(a) in many cases to restrain actions against the principals of the debtor. *In re Ionosphere Clubs, Inc., supra,* (action in District Court by formerly striking airline pilots against, *inter alia,* debtor's chairman of board of directors); *In re Codfish Corp.,* 97 B.R. 132 (Bankr.D.Puerto Rico 1988) (action in District Court by Federal Deposit Insurance Corporation against chief executive officer of Debtor); *In re Kasual Kreation, Inc.,* 54 B.R. 915 (Bankr.S.D.Fla.1985) (action by creditor in Federal District Court against Principals/officers/shareholders of debtor on *personal guarantees* ); *In re MacDonald/Associates, Inc.,* 54 B.R. 865 (Bankr.D.R.I.1985) (action by creditor in State Court against, *inter alia,* officers/shareholders); *Matter of Rustic Mfg., Inc.,* 55 B.R. 25 (Bankr. W.D.Wisc.1985) (action in State Court by creditor against officers/directors/sole shareholders); *In re Northlake Bldg. Partners,* 41 B.R. 231 (Bankr.N.D.Ill.1984) (pre-petition action by mortgagee of debtor in Federal District Court against, *inter alia,* sole general partner); *In re Lion Capital Group,* 44 B.R. 690 (Bankr.S.D.N.Y.1984) (action in Federal District Court by limited partners against, *inter alia,* limited partnerships, principals, parent companies and general partners); *In re Ms. Kipps, Inc.,* 34 B.R. 91 (Bankr.S.D.N.Y.1983) (action in State Court by labor union against debtor's president).

In many of the cases cited above, the actions against principals were enjoined where their time and energy was important to the rehabilitation of a debtor's business or to the formulation of a plan of reorganization.

In *Ionosphere, supra,* the Bankruptcy Court enjoined an action filed in the Federal District Court against, *inter alia,* Frank Lorenzo, chairman of the debtor's board of directors, who was "a central actor in Eastern's [Eastern Airlines] rehabilitation," since allowing this action to proceed would result in substantial time of Lorenzo being distracted from the reorganization process. The Court observed that:

The massive drain on [key officers'] time and energy at this crucial hour of plan formulation in either defending themselves or in responding to discovery requests could frustrate if not doom their vital efforts at formulating a fair and equitable plan of reorganization.

*In re Ionosphere Clubs, Inc.,* 111 B.R. at 435, quoting *In re Johns–Manville Corp., supra,* 26 B.R. at 426.

*In Kasual Kreation, supra,* the Court enjoined a creditor's action against the debtor's principals at a time when their efforts were "essential to the operation of the Debtor's business" and the debtor's reorganization and, therefore, "the failure to obtain the Injunctive Relief requested would result in severe and irreparable harm to the bankruptcy estate." 54 B.R. at 917.

Similarly, in *MacDonald/Associates,* the Court enjoined a plaintiff from proceeding with litigation against the debtor's two sole shareholders/officers, who were "required to devote substantial time and effort overseeing not only the day to day affairs of the business, but the bankruptcy proceeding as well", since "[t]hese key officers must be free ... to devote all their efforts to the operation of the business and the formulation of a plan". *In re MacDonald/Associates, Inc.,* 54 B.R. at 870.

In *Ms. Kipps,* the Court stayed an action against the debtors' president because "[r]equiring him to maintain a defense in another forum will necessarily detract from his efforts to operate and rehabilitate the debtor corporations." 34 B.R. at 93.

In *Third Eighty–Ninth,* 138 B.R. at 147, the District Court in the Southern District of New York set forth, *inter alia,* circumstances warranting injunctive relief as follows:

> Pursuant to their authority under § 105, courts have stayed creditor actions against non-debtor third parties [1] where they have found that the estate will be adversely affected because the action will impede the non-debtor third party from injecting funds into the reorganization, [2] because the action would detract from the invaluable time and attention the non-debtor third party would otherwise devote to the continued operation of the debtor's business or the reorganization effort....

The District Court further stated that contribution of funding to the Debtor's reorganization alone could provide the basis for the issuance of an injunction. *See Third Eighty–Ninth,* 138 B.R. at 147. *See also In re Otero* *Mills, Inc.,* 21 B.R. 777 (Bankr.D.N.M.1982); *aff'd,* 25 B.R. 1018 (D.N.M.1982).

In *Otero Mills,* the bankruptcy court permanently enjoined the bank from executing or otherwise collecting on its state court judgment against the president of the debtor, notwithstanding that his liability arose out of his guaranty of the debtor's notes, as distinguished from the situation in the present case where the claim against the Principals arose out of their direct liability under their Note. By focusing on the principal's intention to contribute to Otero's reorganization, the court premised jurisdiction, and the propriety of a § 105 injunction on the general goal of improving the debtor's chance of reorganization.

*A Judgment In the State Court Action Will Impair The Ability Of The Principals To Raise Funds For The Reorganization*

In the instant action, an injunction under § 105 enjoining the Defendants from commencing and continuing any enforcement proceedings against the Defendants is both necessary and appropriate for several reasons. As appears from the above Findings of Fact, the Principals have testified that they have every intention of injecting their own funds to assist in the reorganization efforts. The Principals testified that they intend to provide between $1 million and $1.6 million to consummate a restructuring with CrossLand, and will attempt to raise additional funding, if necessary, to reach a restructuring agreement with NatWest to reorganize Surrey. They further testified that if the State Court Action is allowed to proceed, their ability to inject funds will be impaired.

*The Principals' Attention Will Be Diverted Substantially From The Debtors' Reorganization*

The continuation and commencement of proceedings against the Principals will demand a substantial amount of their time, to the obvious detriment of the Debtors' reorganization. Because the Principals are the sole participants in the Debtors' rehabilitation, they should be free to devote their full efforts to the operation of the business and the formulation of a plan. Because the Debtors are general partnerships owned and con-

trolled solely by the Principals, the Principals are clearly the only persons who can effectively formulate, negotiate and carry out the Debtors' plan or plans of reorganization.

As District Judge Sweet stated in *Third Eighty–Ninth:*

> Indeed, if it was established that the estate would suffer if the Guarantors' services and attention were compromised by the distraction of defending against the Guaranty Action, this factor could justify a stay. Courts have stayed creditor actions against non-debtor third parties under this rationale where, for example, an officer devoted over 50% of his time to and was "irreplaceable" in the reorganization effort, *In re Lomas Fin. Corp.,* 117 Bankr. 64, 66 (S.D.N.Y.1990), where an officer was a "key staff member" of the reorganization task force, *id.,* where the principals/guarantors performed all or most of the debtor's business, *In re Rustic Manufacturing, Inc.,* 55 Bankr. 25, 31 (Bankr. W.D.Wisc.1985), and where the general partner was "intimately connected" with the management of the debtor's business. *In re Northlake Building Partners,* 41 Bankr. 231, 233 (Bankr.N.D.Ill.1984).

*Third Eighty–Ninth,* 138 B.R. at 147 (emphasis added).

The facts of the instant cases before this Court satisfy the criteria set forth above. As established in the Burman Affidavit and the Principals' uncontradicted testimony, Lazarus and Burman are the key employees of the Debtors and are invaluable to the Debtors' reorganization efforts. Lazarus began the Debtors' operations approximately forty-five years ago, and although he is now semi-retired, he is involved in all important financial decisions made by the Debtors, and in negotiating toward a plan or plans of reorganization. Similarly, Burman is responsible for all day-to-day Debtor activities and, in close consultation with Lazarus regarding financial matters, undertakes many managerial responsibilities on behalf of the Debtors. Thus, the Principals are "intimately connected" with the management of all the Debtors' affairs and are irreplaceable in the Debtors' operations.

Without a stay against pending proceedings, the Principals will be unable to devote their full time and energy toward implementing the Debtors' reorganization, and the Debtors' reorganization will suffer. The pendency of the State Court Action would disrupt the Debtors' operations and would distract the Principals from their key roles in maintaining, operating, and managing the Debtors' assets. Thus, due to the Principals' involvement in the Debtors' businesses and reorganization, it would unduly burden the estates to permit the State Court Action to continue.

In addition to the foregoing cases, other recent decisions have provided for injunctions against principals of the debtors. In *In re Venzke Steel Corp.,* 142 B.R. 183 (Bankr. N.D.Ohio 1992), tort plaintiffs were enjoined for one year from pursuing their state court action against the Chapter 11 debtor's president and sole stockholder where the debtor had established the possibility of a viable reorganization plan, and the expenditure of the debtor's energies and resources in defending the president in the state court action would be to the detriment of the debtor's creditors. In *In re Eagle–Picher Indus.,* 963 F.2d 855 (6th Cir.1992), where litigants were enjoined from pursuing a separate civil action against the debtor's officers, the court stated that:

> the individual defendants [officers] are inextricably intertwined with the Debtor, Eagle–Picher. Thus, it is for the protection of [Debtor's] numerous creditors, not for [the officers], that [litigant] is properly prohibited from proceeding with its action against [the officers], and this prohibition is not a distortion of Congressional purpose.

963 F.2d at 862. In *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285 (2d Cir. 1992), the court held that in bankruptcy cases, a court may enjoin a creditor from enjoining a third party, provided the injunction plays an important part in the debtor's reorganization plan.

*Tests for the Issuance of an Injunction*

■ An injunction under Rule 65 of the Federal Rules of Civil Procedure may be

issued in a bankruptcy adversary proceeding. *See* Bankruptcy Rule 7065; *Ionosphere Clubs,* 111 B.R. at 431. The traditional standards for the issuance of an injunction require the party requesting injunctive relief to show:

a. irreparable harm to the Debtor;

b. reasonable likelihood of success;

c. that injury to movant outweighs any harm to the party to be enjoined; and

d. that the public interest will not be adversely affected.

*Monroe Well Service,* 67 B.R. at 752–53; *Codfish Corp.,* 97 B.R. at 135.

The Debtors have satisfied the necessary elements for the issuance of an injunction under all of the foregoing tests as hereinafter appears.

### Irreparable Harm or Injury

Irreparable harm or injury to the Debtors' reorganization efforts will be sustained by the Debtors if the continuation of proceedings against the Principals is not stayed. First, the Principals' time and energy would be distracted both from the Debtors' daily business affairs and from the Debtors' progressing toward a plan of reorganization. Second, if NatWest is allowed to continue its action against the Principals, the Principals will be required to employ counsel and spend a substantial amount of time and effort defending such actions, and their assets could be substantially depleted.

### Reasonable Likelihood of Success

"Likelihood of success" has been defined, for purposes of an injunction in a bankruptcy case, "as the probability of a successful plan of reorganization." *Kasual Kreation,* 54 B.R. at 916. In this vein, the Debtors' reorganization is at a most critical stage. The Debtors have identified the problems that precipitated their present financial difficulties and have already spent substantial time negotiating and formulating a restructuring plan directed toward reorganization. The implementation of a plan will require the expenditure of substantial time, energy and funding by the Principals. Thus, the Debtors are substantially more likely to reorganize if the State Court Action is stayed.

### Relative Harm to be Suffered

With respect to the additional elements—the relative harm to be suffered—the degree of harm that would inure to NatWest by an injunction being issued is clearly out-weighed by the harm which would be suffered by the Debtors and their estates if an injunction does not issue as is more particularly spelled out in the foregoing discussion. The preliminary injunction will not invalidate the rights of NatWest arising out of the Note. It will merely delay the enforcement of those rights, at least until a plan or plans of reorganization are confirmed or in the event these Chapter 11 cases are dismissed or converted to Chapter 7 cases. Accordingly, NatWest will not suffer any significant harm if an injunction is issued.

### Public Interest

Finally, the public interest can only be further served by the issuance of an injunction in these proceedings. The public interest, in the context of a bankruptcy proceeding, is in promoting a successful reorganization. *See Northlake Building,* 41 B.R. at 234. It is clear that the public interest will best be served if Debtor continues to work as they have toward the eventual goal of successful reorganization. The issuance of an injunction enjoining NatWest from commencing and continuing proceedings against the Principals will permit the Principals to devote their full time and attention to and raise funds for the Debtors' reorganization, thus furthering the public interest. *See In re Eagle–Picher Indus.,* where the Sixth Circuit held that the lower courts did not err in determining that it was in the public interest to issue a preliminary injunction. 963 F.2d 855 (6th Cir.1992).

This Court recognizes that the broad injunctive powers under § 105(a) should be used sparingly. *In re Criadores De Yabucoa, Inc.,* 75 B.R. 96 (Bankr.P.R. 1987). If a creditor is to be enjoined and stayed from prosecuting an action against a non-debtor pursuant to § 105(a), the movant must establish that the estate would be substantially and adversely affected by the continuance of such an action. This Court finds that the facts in the instant case warrant such an injunction.

**902**

In opposition to the Debtors' request for an injunction, NatWest cites various cases which this Court finds to be inapplicable by reason of the facts involved in those respective cases as distinguished from those presented in this proceeding. For example, *Pritts v. Schwartz,* 1993 WL 441730 (E.D.Pa. October 28, 1993) did not involve the Debtors' request for relief under § 105 and it further concerned a Chapter 7 debtor whose estate would be liquidated, not reorganized. *CAE Industries Ltd. v. Aerospace Holdings Co.,* 116 B.R. 31 (S.D.N.Y.1990), also cited by NatWest, is to be distinguished from this instant proceeding by reason of the fact that *CAE* involved a debtor who sought to extend the automatic stay to a non-debtor who held no managerial responsibilities and was not in a position to assist in the debtor's reorganization, nor did that case seek to extend the reach of the automatic stay under § 105. Finally, the case of *Patton v. Bearden,* 8 F.3d 343 (6th Cir.1993), also cited by NatWest, likewise does not apply inasmuch as the facts bear no resemblance to those in the instant proceeding.

For the purpose of this decision in support of the Debtors' motion, this Court is of the opinion that the grounds set forth above and the reasons in support thereof satisfy the criteria required for the preliminary injunction. Thus, there is no need to dwell upon those Findings of Fact which relate to the application of the funds made available to the Principals and the alleged use of them for the benefit of the Debtors, nor to the possible indemnification of the Principals by the Debtors in the event of a recovery by NatWest against the Principals.

### CONCLUSION

The Debtors have satisfied all of the elements necessary for the Court to issue an injunction staying NatWest from the continuation of its state court action against the Principals.

Inasmuch as this Court has been informed that absent a decision on the subject motion for a preliminary injunction as of this date, the action instituted by NatWest will proceed and, therefore, this decision is deemed to be an Order. However, in the event an order is submitted to this Court for signature by any of the parties herein, in conformity with this decision, upon the entry by this Court of such order, the same will be deemed to constitute the order of this Court from which an appeal, if any, will be taken.